JUDGE CARTER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| P.L., A.Q., K.T., R.F.J., A.R.B., B.M.B., and J.C., individually and on behalf of all others similarly situated; BROOKLYN DEFENDER SERVICES; THE LEGAL AID SOCIETY; and THE BRONX DEFENDERS, Plaintiffs<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF JUSTICE; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; RONALD VITIELLO, Deputy Director and Acting Director of ICE, in official capacity; KIRSTJEN NIELSEN, Secretary of Homeland Security, in official capacity; MATTHEW G. WHITAKER, Acting United States Attorney General, in official capacity; MATTHEW T. ALBENCE, Executive Associate Director of ICE Enforcement Removal Operations, in official capacity; THOMAS R. DECKER, Director of New York Field Office of ICE, in official capacity; WILLIAM P. JOYCE, Deputy Director of New York Field Office of ICE, in official capacity; JAMES MCHENRY, Director of Executive Office for Immigration Review, in official capacity; and DANIEL J. DAUGHERTY, Assistant Chief Immigration Judge, in official capacity,<br><br>Defendants | **19 CV 01336**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil Action No. _____ |

## INTRODUCTION

1.      This is an action to restore the constitutional and statutory rights of hundreds of detained immigrants by ending Defendants' exclusive use of video teleconference hearings ("VTC") at Varick Street Immigration Court in New York City.[1]

2.      On June 27, 2018, ICE's New York Field Office ("ICE NY Field Office" or "NY Field Office") announced without warning that it would no longer produce detained immigrants to immigration court to attend their removal proceedings in person ("Refusal to Produce Policy" or "Policy"). Instead, removal proceedings for detained immigrants would be conducted exclusively over VTC, whereby detained immigrants would appear by video feed from the county jails at which they are detained.

3.      Defendants' Policy upended the NY Field Office's long-standing practice of transporting detained immigrants to the Varick Street Immigration Court to appear for their hearings in person. In-person hearings had long helped ensure detained immigrants an opportunity to fully access the courts and participate in their removal proceedings. The ICE NY Field Office had never previously engaged in a broad refusal to produce individuals for in-person hearings.

4.      In-person hearings also allowed the New York Immigrant Family Unity Program ("NYIFUP")—New York City's first-in-the-nation appointed counsel program for detained immigrants who cannot afford an attorney—to flourish. Until the events giving rise to this lawsuit, NYIFUP attorneys were able to screen and identify clients in on-site intake interviews at Varick Street Immigration Court on the day of clients' initial appearances. Under this system, NYIFUP was an immense success. Since 2013, NYIFUP has increased the rate of successful

---

[1] Plaintiffs allege on personal knowledge as to matters relating to Plaintiffs, and on information and belief as to all other matters.

outcomes for detained immigrants by 1,100 percent, confirming that the services provided by
NYIFUP attorneys reduce unnecessary detention and illegal deportations. NYIFUP attorneys
now represent approximately 35 percent of immigrants in proceedings before the Varick Street
Immigration Court.

5.      Defendants rely on a provision of the Immigration and Nationality Act that gives
immigration judges discretion to conduct proceedings through VTC. *See* 8 U.S.C.
§ 1229a(b)(2)(A)(iii). But all VTC proceedings must nonetheless "accord with the constitutional
requirements for due process." *Aslam v. Mukasey*, 537 F.3d 110, 114 (2d Cir. 2008). The ICE
NY Field Office's implementation of a VTC-only system has failed to comply with
constitutional requirements.

6.      Defendants' VTC-only hearings have had disastrous effects on detained
immigrants, the ability of their attorneys to effectively represent them, and the efficiency of the
immigration court. None of the county jails used by the ICE NY Field Office have sufficient
VTC connections to meet the increasing demand of the Varick Street Immigration Court docket.
This means that detained immigrants with scheduled hearings often do not have access to an
available VTC line, and when a line is available, technical failures have been rampant,
preventing detained immigrants from seeing, hearing, or understanding what is happening in the
courtroom. These problems result in frequent delays and are compounded when detained
immigrants require foreign language interpretation services or accommodations due to
disabilities. In addition, the frequent presence of ICE officers in the VTC room from which
detained immigrants testify often discourages the immigrants from testifying about sensitive
personal information that may be vital to their case.

7.     Indeed, at a recent hearing over VTC for Representative Plaintiff J.C.—a detained immigrant with a disability—the immigration judge remarked on the record that he believed there would be a violation of "due process and fundamental fairness" if the ICE NY Field Office forced J.C. to appear for his merits hearing by VTC. The judge elaborated: "If he appears via video, I see a problem with that. I have to protect his constitutional rights and I have an expert who told me that this guy shut down when he interviewed him because of certain technical type issues." Yet under Defendants' Policy, J.C. and all other immigrants detained by the ICE New York Field Office are required to appear by VTC. Defendants' Policy thus severely hampers detained immigrants' ability to participate in their hearings and effectively present their case, and prevents immigration judges from making adequate credibility determinations in accordance with constitutional and statutory due process protections.

8.     Defendants' Policy also prevents detained immigrants from fully engaging with their attorneys. The three NYIFUP organizations—Brooklyn Defender Services, The Bronx Defenders, and The Legal Aid Society (collectively "NYIFUP Providers" or "Organizational Plaintiffs")— face unnecessary and growing costs, as their attorneys must now routinely visit the jails outside of the city for all client matters. NYIFUP attorneys can no longer conduct intake interviews efficiently or confer with their clients immediately before or after hearings. Instead, attorneys are forced to discuss strategy over the VTC lines, often in the presence of jail officers and/or court personnel. Even more troubling, Defendants' Policy prevents these lawyers from being able to confer confidentially with their clients during hearings to provide legal advice, discuss strategy, or review evidence.

9.     Defendants implemented the Policy despite knowing that the system-wide use of VTC could violate the due process rights of detained immigrants. For example, a 2017 report

3

commissioned by Defendant EOIR concluded that court proceedings by VTC should be limited to "procedural matters" because appearances by VTC may lead to "due process issues."[2] Defendants' Policy thus contradicts the recommendations from their own commissioned study regarding the use of VTC.

10.     Defendants implemented the Policy without considering its effect on detained immigrants' constitutional and statutory rights. Defendants conducted no evaluation of their technological capacity to implement a VTC-only system or the obstacles such a system would pose to detained immigrants' ability to access the courts and their attorneys. Defendants provided no warning to the NYIFUP providers or to the private bar regarding the policy, nor any accommodation to allow NYIFUP attorneys to conduct intake and speak confidentially with their clients.

11.     Significantly, Defendants have failed to provide an accurate reason for the Policy. The initial justification for the Refusal to Produce Policy was a purported security threat caused by a small group of peaceful and lawful protesters. But that protest ended the same day that Defendants' announced their new Policy, and it has not returned. Yet the Policy remains. To explain this, Defendants have offered evolving rationales. First it was public safety; then it was cost effectiveness; then it was part of a nationwide plan to streamline immigration proceedings; then it was public safety again. Defendants' shifting justifications are pretext for their real, illegitimate motivation: the government's nationwide effort to expedite deportations at the expense of due process.

12.     The Plaintiffs in this case, P.L., A.Q., K.T., R.F.J., A.R.B., B.M.B., and J.C. (collectively "Representative Plaintiffs"), on behalf of the putative class members ("Putative

---

[2] Booz Allen Hamilton, Department of Justice, Executive Office for Immigration Review Legal Case Study Summary Report ("EOIR Report"), April 6, 2017 at 23.

Class" or "detained immigrants"[3]), and the three NYIFUP Providers—bring this challenge to enforce the government's obligations to provide detained immigrants with constitutional and statutory fair-hearing protections, to ensure full and meaningful access to the courts, and to preserve the right of clients to associate with their attorneys.

13.     Plaintiffs seek a declaration that the Policy as implemented violates protections guaranteed by the First Amendment, the Fifth Amendment, the Immigration and Nationality Act ("INA"), the Administrative Procedure Act ("APA"), and the Rehabilitation Act. Plaintiffs further seek to enjoin the Policy and enjoin Defendants from relying exclusively on VTC technology to conduct proceedings before the Varick Street Immigration Court.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331. The United States has waived sovereign immunity for purposes of this case. *See Polanco v. U.S. Drug Enforcement Admin.*, 158 F.3d 647, 652 (2d Cir. 1998) (noting that "sovereign immunity is waived by the Administrative Procedure Act" when "the complaint seeks only equitable relief"); *see also* 5 U.S.C. §§ 702, 706 (Administrative Procedure Act) (providing the right to judicial review and defining the scope of review).

---

[3] Although the term "immigrant" is used for convenience, Plaintiffs note that the proposed class likely includes U.S. citizens wrongfully deemed to be noncitizens by ICE. *See, e.g., Jaen v. Sessions*, 899 F.3d 182, 184 (2018) (concluding that a Brooklyn Defender Services client detained at the direction of the ICE NY Field Office was, in fact, a U.S. citizen); *id.* at 190–91 and n.2 (Pooler, J., concurring) (expressing concern that immigration officials had detained Mr. Jaen for two years, and noting that his case "does not seem to be entirely aberrational"); *Watson v. United States*, 865 F.3d 123 (2d Cir. 2017) (discussing case of New York resident and U.S. citizen Davino Watson, who was held in immigration detention for over three years). Between 2012 and mid-2018, ICE released over 1,480 individuals from immigration detention after investigating their citizenship claims. Paige St. John & Joel Rubin, *ICE held an American man in custody for 1,273 days. He's not the only one who had to prove his citizenship*, L.A. Times (Sept. 17, 2018), https://www.latimes.com/local/lanow/la-me-citizens-ice-20180427-htmlstory.html.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (e) because one or more defendants' place of business is in this District and a substantial part of the events or omissions giving rise to the claim occurred and continue to occur in this District.

16.     Personal jurisdiction is proper because one or more defendants' place of business is in this District, and the events or omissions giving rise to the claim occurred and continue to occur in this District.

PARTIES

17.     Representative Plaintiff P.L. is a lawful permanent resident who has lived in the United States since 2011. He has been detained by the ICE NY Field Office since March 14, 2018 pending the outcome of his removal proceedings at the Varick Street Immigration Court. He is currently detained at Hudson County Jail.

18.     Representative Plaintiff K.T is a lawful permanent resident who has lived in the United States since he was a teenager. He has been detained by the ICE NY Field Office since July 13, 2018 pending the outcome of his removal proceedings at the Varick Street Immigration Court. He is currently detained at Orange County Jail.

19.     Representative Plaintiff A.Q. has lived in the United States since he was a toddler and has been a lawful permanent resident since he was eight years old. He has been detained by the ICE NY Field Office since February 1, 2018 and is currently detained pending the outcome of his appeal of a removal order issued by the Varick Street Immigration Court. He is currently detained at Essex County Jail.

Case 1:19-cv-01336-ALC   Document 2   Filed 02/12/19   Page 8 of 59

20.     Representative Plaintiff R.F.J. has been detained by the ICE NY Field Office

since January 2018 pending the outcome of their removal proceedings at Varick Street

Immigration Court.[4]  They are currently detained at Bergen County Jail.

21.     Representative Plaintiff B.M.B. has continuously resided in the United States for

32 years.  B.M.B. has been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), major

depressive disorder, and a major neurocognitive disorder due to a traumatic brain injury.  He has

been detained by the ICE NY Field Office since April 2018 pending the outcome of his removal

proceedings at Varick Street Immigration Court.  He is currently detained at Bergen County Jail.

22.     Representative Plaintiff A.R.B. has been detained by the ICE NY Field Office

since April 2018 pending the outcome of his removal proceedings at Varick Street Immigration

Court.  He is currently detained at Bergen County Jail.

23.     Representative Plaintiff J.C. has been diagnosed with cognitive impairments and

been deemed incompetent by an immigration judge.  He has been detained by the ICE NY Field

Office since March 2018 pending the outcome of his removal proceedings at Varick Street

Immigration Court.  He is currently detained at Hudson County Jail.

24.     Organizational Plaintiff Brooklyn Defender Services ("BDS") is a public defender

organization that represents nearly 30,000 low-income residents of Brooklyn and elsewhere each

year in criminal, family, civil, and immigration proceedings, providing interdisciplinary legal

and social services since 1996.  Since 2009, BDS has counseled, advised, or represented more

than 10,000 clients in immigration matters including deportation defense, affirmative

applications, and advisals.  Since 2013, BDS has represented more than 1,200 detained

---

[4] Plaintiff R.F.J. identifies as gender non-conforming and uses they/them pronouns.

7

immigrants through NYIFUP. BDS represents three Representative Plaintiffs, P.L., K.T., A.Q., and hundreds of detained immigrants in removal proceedings.

25.     Organizational Plaintiff The Bronx Defenders ("BxD") is a public defender organization that provides innovative, holistic, and client-centered criminal defense, family defense, civil legal services, and social work support to roughly 30,000 indigent people in the Bronx and elsewhere each year. BxD maintains an immigration practice focused on early intervention, immigration advice in pending criminal cases, benefits advocacy, and deportation defense. BxD has represented detained immigrants through NYIFUP since 2013. BxD represents three Representative Plaintiffs, R.F.J., B.M.B., and A.R.B., and hundreds of detained immigrants in removal proceedings.

26.     Organizational Plaintiff The Legal Aid Society ("LAS") is the oldest and largest program in the nation providing direct legal services to low-income families and individuals. With its annual caseload of more than 300,000 legal matters, LAS takes on more cases for more clients than any other legal services organization in the United States. LAS's Civil Practice maintains an Immigration Law Unit ("ILU"), which has over 3,000 open immigration matters, including over 850 cases in removal proceedings. The ILU practice includes a broad range of legal services including, but not limited to, deportation defense, affirmative applications, family-based adjustment, Special Immigrant Juvenile Status, and federal matters before the New York and New Jersey district courts and the Second and Third Circuit Courts of Appeals. Since 2014, LAS has represented more than 1000 detained immigrants through NYIFUP. Legal Aid currently represents one Representative Plaintiff, J.C., and over one hundred detained immigrants in removal proceedings.

27.     BDS, BxD, and LAS collectively represent hundreds of detained immigrants in bond proceedings, competency hearings, and individual merits hearings in immigration court.[5]

28.     Defendant United States Immigration and Customs Enforcement ("ICE") is a component of the United States Department of Homeland Security headquartered in Washington, D.C. ICE is charged with enforcing the federal immigration laws and seeks to arrest, detain, and deport removable immigrants in the United States.

29.     Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States Government responsible for, among other things, enforcing federal immigration laws and ensuring border security. DHS is headquartered in Washington, D.C.

30.     Defendant United States Department of Justice ("DOJ") is the chief law enforcement agency of the United States. DOJ is responsible for overseeing and making policy on behalf of the Executive Office for Immigration Review, which oversees immigration judges. DOJ's mission is to enforce the law, including the constitutional and statutory rights of immigrants. DOJ is headquartered in Washington, D.C.

31.     Defendant Executive Office for Immigration Review ("EOIR") is an office within DOJ, headquartered in Falls Church, Virginia. EOIR is responsible for adjudicating immigration cases and oversees the Board of Immigration Appeals and the Office of the Chief Immigration Judge.

32.     Defendant William P. Joyce is the Deputy Field Office Director of the ICE NY Field Office. He is responsible for the enforcement of the federal immigration laws in New York

---

[5] The detained immigrants discussed in this lawsuit are subject to removal proceedings, commonly referred to as deportation proceedings. Throughout their proceedings, detained immigrants file applications and make legal arguments at status hearings referred to as "master calendar hearings," and participate in bond hearings, final merits hearings referred to as "individual hearings," and, where necessary, "M-A-M hearings" to assess competency.

9

City and surrounding counties within New York, including the NY Field Office's Refusal to
Produce Policy. He is also responsible for ensuring that all individuals in ICE custody are
detained in accordance with the Constitution and all relevant statutes and laws. His address is
ICE New York Field Office, 26 Federal Plaza, 11th Floor, New York, New York 10278.
Defendant Joyce is named in his official capacity.

33.     Defendant Thomas R. Decker is the Director of the ICE NY Field Office. He is
primarily responsible for the implementation and enforcement of policies concerning the federal
immigration laws in New York City and surrounding counties within New York, including the
NY Field Office's Refusal to Produce Policy. He is also responsible for ensuring that all
individuals in ICE custody are detained in accordance with the Constitution and all relevant
statutes and laws. He supervises Defendant William P. Joyce. His address is ICE New York
Field Office, 26 Federal Plaza, 11th Floor, New York, New York 10278. Defendant Decker is
named in his official capacity.

34.     Defendant Matthew T. Albence is the Executive Associate Director of ICE
Enforcement Removal Operations. He is responsible for overseeing ICE's day-to-day operations
and managing operational staff in the implementation and enforcement of policies concerning
federal immigration laws. He is also responsible for ensuring that all individuals in ICE custody
are detained in accordance with the Constitution and all relevant statutes and laws. He
supervises Defendant Decker. His address is U.S. Immigration and Customs Enforcement, 500
12th Street, SW, Washington, D.C. 20536. Defendant Albence is named in his official capacity.

35.     Defendant Ronald Vitiello is the Deputy Director and Acting Director of ICE. He
is responsible for setting and enforcing policy concerning federal immigration laws. He is also
responsible for ensuring that all individuals in ICE custody are detained in accordance with the

10

Constitution and all relevant statutes and laws. He supervises Defendants Matthew T. Albence and Thomas R. Decker. His address is U.S. Immigration and Customs Enforcement, 500 12th Street, SW, Washington, D.C. 20536. Defendant Vitiello is named in his official capacity.

36.     Defendant Kirstjen Nielsen is the Secretary of DHS. She is responsible for the administration and enforcement of the federal immigration laws. She is also responsible for ensuring that all individuals in ICE custody are detained in accordance with the Constitution and all relevant statutes and laws. Defendant Nielsen oversees the agencies within DHS, including ICE. She supervises Defendant Ronald Vitiello. Her address is U.S. Department of Homeland Security, 800 K Street, NW #1000, Washington, D.C., 20528. Defendant Nielsen is named in her official capacity.

37.     Defendant Daniel J. Daugherty is the Assistant Chief Immigration Judge for the Varick Street Immigration Court. He is responsible for overseeing immigration judges at Varick Street and ensuring that the proceedings are conducted in accordance with the constitutional and statutory rights of immigrants. His address is 110 North City Parkway, Suite 400, Las Vegas, Nevada 89106. Defendant Daugherty is named in his official capacity.

38.     Defendant James McHenry is the Director of the Executive Office for Immigration Review. He is responsible for the oversight of immigration proceedings and ensuring that they are conducted in accordance with the constitutional and statutory rights of immigrants. His address is 5107 Leesburg Pike, Falls Church, Virginia 22041. Defendant McHenry is named in his official capacity.

39.     Defendant Matthew G. Whitaker is the Acting Attorney General of the United States. He oversees DOJ and, in that capacity, oversees EOIR. His address is 950 Pennsylvania Avenue, NW, Washington, D.C. 20530. Defendant Whitaker is named in his official capacity.

11

## LEGAL FRAMEWORK

40.     The Due Process Clause of the Fifth Amendment of the United States Constitution forbids the government from depriving an individual of life, liberty, or property without due process of law. U.S. Const. amend. V.

41.     The Petition Clause of the First Amendment of the United States Constitution guarantees the right of access to courts and prohibits the government and its agents from unjustifiably obstructing that access. U.S. Const. amend. I.

42.     The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*. ("INA"), governs removal proceedings. Proceedings conducted pursuant to the INA must comport with the constitutional requirements for due process, which include procedures that ensure that immigrants receive a full and fair hearing on their claims. *Aslam*, 537 F.3d at 114.

43.     The INA also guarantees immigrants access to counsel during their removal proceedings. Specifically, the INA provides each noncitizen with "the privilege of being represented, at no expense to the government, by counsel of the alien's choosing," the opportunity to examine evidence presented against him or her, and the ability to present evidence on his or her own behalf and cross-examine Government witnesses. 8 U.S.C. § 1229a(b)(4).

44.     The INA contemplates that immigrants may be detained or at liberty during their immigration proceedings. 8 U.S.C. § 1226(a)(1), (2). Immigrants who are detained pending their removal proceedings are detained for civil, not criminal proceedings. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Pursuant to contracts between the county jails and ICE, immigrants detained by the NY Field Office are held in civil immigration detention in county

12

jails in New Jersey and New York in conditions akin to criminal incarceration.[6]  As a result, detained immigrants' access to the outside world, including access to their attorneys, is limited, monitored, and sometimes recorded.

45.     While the INA contemplates some removal proceedings potentially being conducted through VTC, 8 U.S.C. § 1229a(b)(2)(A)(iii), the use of VTC must always "accord with the constitutional requirements for due process." *Aslam*, 537 F.3d at 114.

46.     The INA vests immigration judges, employees of EOIR, with the authority to compel in-person production of immigrants from the jails where they are confined to the courthouse for their immigration proceedings.  8 C.F.R. §§ 1003.35(b)(1), 1240.1(c).

47.     The Rehabilitation Act requires the government to make reasonable accommodations for individuals with disabilities to ensure they can access government benefits and opportunities.  29 U.S.C. §§ 701, 794(a).

48.     As Plaintiffs allege herein, the Defendants' Policy of exclusively using VTC does not comport with detained immigrants' and the Organizational Plaintiffs' constitutional and statutory rights.

## STATEMENT OF FACTS

### Removal Proceedings in New York City

49.     Each year, the federal government arrests, detains, and ultimately seeks to remove over a hundred thousand immigrants from the United States.[7]

---

[6] Individuals detained by the NY Field Office are typically held at the Hudson County Jail in Kearny, New Jersey, the Bergen County Jail in Hackensack, New Jersey, or the Orange County Jail in Goshen, New York.

[7] *See, e.g.*, ICE Impact in FY 2017, https://www.ice.gov/topics/fy2017 (last visited Feb. 10, 2019) (noting that in 2017, ICE arrested more than 143,000 immigrants and removed more than 81,000 people from the United States).

50.     Defendant ICE is responsible for arresting, processing, and detaining immigrants that Defendant DHS seeks to remove from the United States. Defendant ICE's New York Field Office is responsible for processing all arrests and removal cases in the New York City area.[8] Those immigrants detained by the NY Field Office are held in civil immigration detention in county jails in New Jersey and New York pursuant to those county jails' contracts with ICE.

51.     For administrative purposes, the immigration courts in New York distinguish between immigrants who are: a) detained during the pendency of their proceedings and b) those who are released on bond or recognizance, or never detained during proceedings.

52.     Proceedings for immigrants detained by ICE—the "detained docket"—generally take place at 201 Varick Street, New York, New York ("Varick Street Immigration Court"). During fiscal year 2018, the Varick Street Immigration Court processed 1,777 new cases of immigrants who were detained following an arrest by ICE.[9]

53.     During fiscal year 2018, the ICE NY Field Office and EOIR jointly processed and adjudicated the removal cases of 27,037 immigrants in the New York City area.[10]

---

[8] Defendant ICE maintains two field offices in New York State—the ICE NY Field Office in New York City and the Buffalo Field Office. The ICE NY Field Office exercises jurisdiction over proceedings in New York City as well as Dutchess, Nassau, Putnam, Suffolk, Sullivan, Orange, Rockland, Ulster, and Westchester counties. Policies and procedures of the Buffalo Field Office are not at issue in this case.

[9] *See New Deportation Proceedings Filed in Immigration Court*, TRACImmigration, https://trac.syr.edu/phptools/immigration/charges/deport_filing_charge.php. If a noncitizen is initially detained but subsequently posts bond following a hearing, his or her case generally will be transferred to the non-detained docket at 26 Federal Plaza, New York, New York. However, EOIR has recently begun conducting some proceedings for the detained docket via videoconference at 26 Federal Plaza. In addition, EOIR has informed the NYIFUP Providers that starting in March 2019, it will conduct some proceedings for the non-detained docket in new courtrooms at the Varick Street Immigration Court. Individuals with removal proceedings pending on the non-detained docket are not members of the putative class.

[10] *See id.*

14

### The Immigrant Representation Crisis and History of NYIFUP

54.     Immigrants facing deportation are frequently unrepresented. Removal

proceedings are the only legal proceedings in the United States where people are detained by the

federal government and required to litigate for their liberty against trained government attorneys

without any guaranteed assistance of counsel. Yet the consequence of these proceedings—

permanent exile from the United States and separation from family, friends, and loved ones—can

be just as severe as, or even more harsh than, criminal imprisonment.

55.     The individuals facing deportation are nearly universally vulnerable: they often

are unfamiliar with the legal system, lack financial resources, face language barriers, and are

susceptible to coercion by incompetent or unscrupulous "advocates."

56.     In 2010, recognizing the magnitude of problems associated with the low rates of

legal representation in immigration proceedings, Chief Judge Robert A. Katzmann of the U.S.

Court of Appeals for the Second Circuit[11] convened the Study Group on Immigrant

Representation (the "Study Group"). The Study Group began the New York Immigrant

Representation Study, a two-year study of the immigrant representation crisis in New York.

57.     In December 2011, the Study Group issued a report titled *Accessing Justice: The*

*Availability and Adequacy of Counsel in Immigration Proceedings*.[12] The report quantified the

scale and nature of the barriers to representation faced by noncitizens in removal proceedings. It

found that 60 percent of New York's detained immigrants did not have legal representation, and

only three percent of New York's detained, unrepresented immigrants achieved successful

---

[11] Judge Katzmann was appointed to the Second Circuit in 1999 and became the chief judge on September 1, 2013.

[12] New York Immigrant Representation Study, *Accessing Justice: The Availability and Adequacy of Counsel in Immigration Proceedings* (Dec. 2011) at 3, https://www.ils.ny.gov/files/Accessing%20Justice.pdf.

15

outcomes in court.[13]  The study concluded that many deported immigrants had credible and
legitimate bases to lawfully remain in the United States but, without representation, were facing
unjust removal.

58.     In 2013, a coalition of equal justice and immigrant rights organizations won the
support of the New York City Council for the creation of the NYIFUP program.  Initially a pilot
that in 2014 became fully funded, NYIFUP is the first program in the nation providing publicly-
funded counsel to detained immigrants who cannot afford an attorney and are facing deportation
and separation from their families and communities.

59.     Since 2014, New York City has administered the NYIFUP program by
contracting with BDS, BxD, and LAS to provide deportation defense for detained immigrants at
the Varick Street Immigration Court.  NYIFUP attorneys represent clients in immigration court
and on appeal and provide ancillary services as needed.

## NYIFUP Proves an Immense Success

60.     Since the establishment of NYIFUP in 2014, the NYIFUP Providers have
defended thousands of detained immigrants in removal proceedings, won release from ICE
custody for over 900 clients, and won cases for over 500 clients.  In 2018, over 700 detained
immigrants received representation through the program.  NYIFUP attorneys now represent
approximately 35 percent of detained immigrants in proceedings before the Varick Street
Immigration Court.

61.     The outcomes for detained immigrants have improved dramatically since
NYIFUP was implemented.  A 2017 evaluation report estimated that 48 percent of NYIFUP

---

[13] *Id.*

16

clients achieve successful outcomes in their cases.[14]  Before NYIFUP, the success rate for

unrepresented detained individuals was just 4 percent.[15]  This represents a 1,100 percent increase

in successful outcomes for detained noncitizens at the Varick Street Immigration Court.  These

results confirm that the legal representation provided by NYIFUP allows detained immigrants to

fully and fairly present their case.

### Varick Street Court Proceedings Before June 2018

62.    Until the events giving rise to this lawsuit, the ICE NY Field Office had

maintained the regular practice of transporting detained immigrants to Varick Street Immigration

Court for their immigration hearings.

63.    Prior to implementation of the Policy, NYIFUP attorneys conducted on-site

eligibility interviews and prepared income assessments in person in a private meeting space at

the Varick Street Immigration Court on the day of an individual's initial appearance.  The vast

majority of detained immigrants who appeared at intake qualified for a NYIFUP attorney and

were otherwise unrepresented.

64.    If the NYIFUP attorneys determined that a detained immigrant was eligible for

NYIFUP services, an attorney was assigned the case and proceeded to conduct a comprehensive

client interview and provide initial legal advice.  During the intake process, NYIFUP staff also

conducted conflicts checks and other administrative steps necessary to their representation.

65.    All of these meetings between attorney and client took place in person, one-on-

one, immediately prior to the detained immigrant's initial immigration court appearance.  During

---

[14] Jennifer Stave et al., *Evaluation of the New York Immigrant Family Unity Project:  Assessing the Impact of Legal Representation on Family and Community Unity* at 6, (Nov. 2017), https://storage.googleapis.com/vera-web-assets/downloads/Publications/new-york-immigrant-family-unity-project-evaluation/legacy_downloads/new-york-immigrant-family-unity-project-evaluation.pdf.

[15] *Id.*

17

such initial meetings, the attorney would discuss the upcoming court proceeding and explore how the client wanted to approach the case. Later that same day, the attorney would enter an appearance on the detained immigrant's behalf.

66.     This confidential intake process—which depended on the in-person production of detained immigrants—was critical to the NYIFUP program's mission of providing universal representation for detained immigrants. Moreover, it provides a reasonable and effective way for the detained immigrant to access and retain counsel.

67.     Following the initial appearance, ICE continued to produce detained immigrants in person for all remaining hearings in their removal proceedings. NYIFUP attorneys were able to meet with their clients in person at the Varick Street Immigration Court to provide updates on their case and discuss legal strategy.

68.     Because they appeared in person, detained immigrants had the opportunity to consult with counsel before, during, and after hearings in order to confirm strategy, clarify facts, review evidence, or otherwise discuss the day's proceedings. Where detained immigrants required more than a brief consultation with their counsel in the midst of proceedings, attorneys were able to consult in meeting rooms adjacent to the immigration court or to briefly adjourn the case and recall it later that same day, after privately convening with their client.

69.     During the proceedings, interpreters were available for detained immigrants who communicated best in a language other than English. The majority of these interpreters appeared in person and were able to communicate with detained immigrants from a distance of a few feet or less.

70.     The close physical proximity typically allowed for efficient simultaneous interpretation. Counsel could monitor the effectiveness and accuracy of the translation. The

physical proximity also provided detained immigrants with a ready opportunity to indicate if they were unable to follow any aspect of the proceeding.

71.     Where an interpreter was not available in person, one was provided telephonically. In those instances, the telephonic interpretation was broadcast throughout the court via a speaker system and the detained immigrant, the judge, the lawyers, and any witnesses could be heard. And even though the interpreter was interpreting remotely, detained immigrants could at least identify who was speaking throughout the proceedings.

### ICE Implements its Policy of Refusing to Produce Immigrants to Court

72.     On Monday, June 25, 2018, Defendants suddenly halted in-person production of detained immigrants for proceedings at the Varick Street Immigration Court. Attorneys from NYIFUP and the private bar reported to the Varick Street Immigration Court for the day's proceedings, only to discover that the NY Field Office had refused to produce any of the individuals on the docket. As a result, all hearings at the Varick Street Immigration Court were canceled, delaying for months that day's scheduled immigration proceedings.

73.     On Wednesday, June 27, 2018, the NY Field Office announced that it would no longer produce detained immigrants for their immigration hearings in person. Under the Policy, immigrants remain detained at local county jails during the pendency of their removal proceedings. The only opportunity for them to participate in their own proceedings is by VTC from the county jail where they are detained.

74.     The purported justification Defendants provided for the Policy was an unspecified security threat to ICE employees, immigration court personnel, and detained immigrants caused

by a small group of peaceful demonstrators at Varick Street Immigration Court protesting the federal government's policy of separating children and parent migrants at the southern border.[16]

75.     Protest organizers ceased the protest by midday on June 27. Yet ICE did not revert to in-person production of detained immigrants and has refused to do so.[17]

76.     Defendants implemented the Refusal to Produce Policy without warning and without ensuring that the Policy was implemented in a manner that would comply with detained immigrants' constitutional and statutory rights. They implemented the Policy with no testing period to evaluate and address potential technological issues or the obstacles to detained immigrants' ability to access the courts and their attorneys. They provided no warning to the NYIFUP providers or the private bar regarding the Policy, nor any accommodation to allow NYIFUP attorneys to conduct intake and speak confidentially with their clients. And Defendants performed no evaluation to assess and address the array of interpretation, delay, and other problems caused by the Policy. Indeed, for the reasons alleged herein, it is unlikely that any across-the-board nonproduction policy could ever meet constitutional and statutory requirements.

---

[16] Deepti Hajela, *ICE Suspends In-person Hearings at NYC Immigration Court* (June 27, 2018), https://www.usnews.com/news/best-states/new-york/articles/2018-06-27/ice-suspends-in-person-hearings-at-nyc-immigration-court.

[17] On December 7, 2018, Defendants advised the Organizational Plaintiffs that ICE would "temporarily resume" in-person production of immigrants housed at Bergen County Jail—one of the three facilities where immigrants are typically detained pending their proceedings at Varick Street Immigration Court—while ICE "continue[s] [its] efforts to augment the VTC capacity at that facility." And as recently as February 2019, the NY Field Office has occasionally produced some immigrants detained at Hudson County Jail for in-person hearings at 26 Federal Plaza, in order to avoid problems caused by VTC. However, the ICE NY Field Office has made clear that it seeks full implementation of VTC-only hearings for all detained immigrants within its custody. Defendants' temporary and piecemeal production of certain detained immigrants due to the problems caused by VTC is an implicit concession that Defendants' implementation of VTC has been inadequate and jeopardizes the constitutional and statutory rights of detained immigrants. The piecemeal approach also leads to chaos and unpredictability that further interferes with the rights of detained immigrants and the Organizational Plaintiffs.

## Defendants' Shifting Policy Justifications

77.     Defendants' justifications for the Refusal to Produce Policy have been inconsistent and have shifted repeatedly over time.  These purported justifications are merely pretext for the true reasoning behind the Policy—limiting due process, access to the courts, and counsel for immigrants in an effort to rush deportations and deport more people.

78.     On June 24, 2018, President Trump responded to the national uproar over his administration's family-separation policy by tweeting that immigrants who enter the United States without authorization should be deported without due process.[18]



**Donald J. Trump** ✔
@realDonaldTrump

We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came. Our system is a mockery to good immigration policy and Law and Order. Most children come without parents...

11:02 AM - Jun 24, 2018

79.     ICE implemented its Refusal to Produce Policy just three days later.  ICE suggested that the Varick Street protest posed safety threats to ICE employees, court personnel, detained immigrants, and the general public, and that the Refusal to Produce Policy aimed to protect all involved.  However, ICE did not identify any specific threats, all reports indicated that the protest was peaceful, and the limited protest ended the same day ICE offered this justification.

80.     On July 5, 2018, President Trump's again tweeted that unauthorized immigrants should be removed from the country without access to courts.[19]

---

[18] Donald Trump (@realDonaldTrump), Twitter (June 24, 2018, 11:02 AM),
https://twitter.com/realdonaldtrump/status/1010900865602019329.



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> [Follow]
>
> Congress must pass smart, fast and reasonable Immigration Laws now. Law Enforcement at the Border is doing a great job, but the laws they are forced to work with are insane. When people, with or without children, enter our Country, they must be told to leave without our........
>
> 7:08 AM - 5 Jul 2018



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> [Follow]
>
> .....Country being forced to endure a long and costly trial. Tell the people "OUT," and they must leave, just as they would if they were standing on your front lawn. Hiring thousands of "judges" does not work and is not acceptable - only Country in the World that does this!
>
> 7:16 AM - 5 Jul 2018

81.     On July 24, 2018, long after the Varick Street protest ended, ICE re-characterized the purpose and effect of the Policy, explaining that although "[t]he protests may have cleared, [] the misinformation and threats against ICE employees have continued."[20]  ICE did not—and to this day has not—identified either any threats against ICE employees or any alleged misinformation.

---

[19] Donald Trump (@realDonaldTrump), Twitter (July 5, 2018, 7:08 AM), https://twitter.com/realdonaldtrump/status/1014873774003556354; Donald Trump (@realDonaldTrump), Twitter (July 5, 2018, 7:16 AM), https://twitter.com/realdonaldtrump/status/1014875557557804034.

[20] Steven Trader, *Immigrants' In-Person Hearings Halted in NYC, Dems Ask Why* (July 24, 2018), https://www.law360.com/articles/1066269/immigrants-in-person-hearings-halted-in-nyc-dems-ask-why.

82.     On July 31, 2018, ICE changed its story yet again.  ICE stated for the first time

that the Policy was "not specific to protesters at the Varick Street location," contradicting its

earlier statements, and that the Policy was "not a punishment or retaliation in any way."[21]

Nonetheless, ICE returned to its original explanation, arguing that the Policy was implemented

not only to protect ICE employees, but to ensure the safety of the court, the public, and the

detainees.

83.     In late September 2018, the ICE NY Field Office admitted that the Policy was

originally implemented "in response to protests, threats, and the possibility of court

cancellations," but provided, for the first time, a *post hoc* rationale: ICE's refusal to produce

detained immigrants was continuing because it was "far more cost effective."  Defendants

provided no cost studies or other data to support this newly-offered justification.  Nor have

Defendants released information about the costs incurred because of the Policy, such as expenses

related to adopting and maintaining the technology or the financial costs of detaining individuals

whose proceedings are prolonged due to VTC-related delay.

84.     In late October 2018, the ICE NY Field Office offered another new explanation—

that the policy shift is part of a larger nationwide plan to stop producing detained immigrants in

court—and claimed that the June 2018 protests expedited the implementation.  The ICE NY

Field Office further represented that a continuing threat to safety stemming from the protests is

*not* the reason for maintaining the Policy.  Instead, Defendants provided the vague justification

that the Policy is warranted by cost-effectiveness, efficiency, public or officer safety, and

mitigation of risk.

---

[21] Emma Whitford, *More Than a Month After Anti-ICE Protests, Detained NYC Immigrants Still Denied In-Person Hearings* (July 31, 2018), https://theappeal.org/more-than-a-month-after-anti-ice-protests-detained-nyc-immigrants-still-denied-in-person-hearings/.

23

85.     In early November 2018, the ICE NY Field Office reverted to its original rationale, implying that security and safety concerns were the chief motivation behind the policy change, pointing to the June 2018 protests, a 2015 breach of security unrelated to transporting immigrants to the Court, and three court cancellations due to inclement weather in 2017 and 2018.

86.     No protests have been reported at the Varick Street Immigration Court since the peaceful and lawful demonstrations in June 2018, and ICE has not identified any ongoing safety threat. Meanwhile, proceedings in the immigration courts have been thoroughly disrupted by the use of VTC, creating a far *less* efficient system that has resulted in repeated delays and adjournments in removal proceedings for detained immigrants in Defendants' custody.

## Government Study Concludes VTC Causes "Due Process Issues"

87.     In April 2017, Defendant EOIR commissioned a study of the United States' immigration system and the growing number of pending cases in the immigration courts. The study specifically examined the use of VTC as a means for conducting immigration hearings.

88.     The EOIR Report also recognized that "[i]t is difficult for judges to analyze eye contact, nonverbal forms of communication, and body language over VTC."[22]

89.     The EOIR Report went so far as to state that "[f]aulty VTC equipment, especially issues associated with poor video and sound quality, can disrupt cases to the point that due process issues may arise." It found that 29 percent of staff reported that VTC caused "a meaningful delay in their ability to proceed with their daily responsibilities."[23]

---

[22] EOIR Report at 23.

[23] *Id.*

24

90.     Because of the due process issues caused by VTC, the EOIR Report advised
against the blanket use of VTC, recommending instead that use of VTC should be limited to
"procedural matters."[24]

91.     The EOIR Report is not alone in concluding that the blanket use of VTC—the
very system Defendants seek to use for all detained immigrants in the custody of the ICE NY
Field Office—creates due process problems.  A June 2017 Government Accountability Office
study of immigration court backlogs and operational challenges ("GAO Study") expressed
concern that the use of VTC in lieu of in-person hearings "could have an effect on the outcomes
of those immigration hearings."[25]

92.     The GAO Study reported that "immigration court officials, experts, and
stakeholders . . . expressed concern that the use of VTC technology poses challenges for holding
immigration hearings" and noted that court officials conducting hearings via VTC regularly
encountered "difficulties maintaining connectivity, hearing respondents, exchanging paper
documents, conducting accurate foreign language interpretation, and assessing the demeanor and
credibility of respondents and witnesses."[26]

93.     Immigration court officials interviewed for the GAO Study conceded that "they
had changed their assessment of a respondent's credibility that was initially made during a VTC
hearing after holding a subsequent in-person hearing."[27]

---

[24] *Id.*

[25] Immigration Court: Actions Needed to Reduce Backlogs and Address Long-Standing Management and Operational Challenges, GAO 17-438 at 157 ("GAO Study"), https://www.gao.gov/assets/690/685468.pdf.

[26] *Id.* at 55.

[27] *Id.*

94.     The report noted that one immigration judge "does not like to hold VTC hearings because it is sometimes hard to hear and fully comprehend what is being said over VTC, which, according to this judge, can make it difficult to assess the respondent's demeanor and credibility."[28]

95.     In addition to these studies, line attorneys for Defendant DHS have recently made the same argument. In opposing motions for telephonic testimony by a third-party expert witness, they have asserted that "[t]he optimal way of conducting a trial is for the witness to appear in person in court to face both parties and to be subject to cross-examination in their presence." This is all the more true when it comes to the testimony of individuals subject to the removal proceedings, for whom the credibility determination is paramount.

96.     Indeed, the numerous problems with VTC identified by the EOIR Report, GAO Study, and Defendant DHS are the exact problems suffered by Plaintiffs and the Putative Class. Assistant Chief Immigration Judge ("ACIJ") Daniel Daugherty has even submitted a declaration in a separate case in this District, *Vazquez Perez v. Decker*, Case No. 1:18-cv-10683, in which he attests to this very fact. He states that Defendants' Policy "has created challenges in getting enough access to [VTC] lines" for "a majority of individuals scheduled for initial hearings at Varick Street." Declaration of the Honorable Daniel J. Daugherty at 9, *Vazquez Perez v. Decker*, (S.D.N.Y. Jan. 28, 2019), Case No. 1:18-cv-10683 (Doc. 67). The declaration explains that when Defendants implemented their policy, "only one of three VTC lines in Bergen County Jail was operable, and had to be shared with state county courts, which limited the number of hearings that Varick Street could hold." *Id.*

---

[28] *Id.* at 58.

97.     A memorandum of law filed in that case by the U.S. Attorney for the Southern District of New York further concedes that ICE's refusal to produce detained immigrants "to the Varick Street Immigration Court for proceedings" has "created challenges for the timely scheduling of hearings." Memorandum of Law in Opposition re: Motion for Preliminary Injunction at 21, *Vazquez Perez v. Decker*, Case No. 1:18-cv-10683 (Doc. 71).

## Defendants' Policy Harms the Representative Plaintiffs and Putative Class

98.     Defendants' Policy impedes detained immigrants' rights to due process, access to courts and counsel, and associated statutory rights. Under the Policy, Representative Plaintiffs and the Putative Class are neither provided the opportunity to fully participate in their proceedings nor have they had adequate access to confidential communications with counsel. The rampant technical failures of Defendants' VTC-only hearings violate Representative Plaintiffs' due process rights afforded by the Constitution and the INA.

### Defendants' Policy Causes Repeated Adjournments

99.     The Refusal to Produce Policy causes repeated adjournments that substantially delay the resolution of immigration cases due to limited VTC lines and technological failures, needlessly prolonging detention.

100.    Hudson County Jail has only three VTC lines while the other two facilities, Bergen and Orange, have only one line each. These lines can each only be used for a single VTC call at a time.[29]

---

[29] Defendants have repeatedly recognized the need for additional VTC lines. In late October 2018, the ICE NY Field Office stated that it would be increasing to four VTC lines at Hudson within in a matter of days and an increase to three lines at Bergen was not far behind. The ICE NY Field Office reiterated this promise about additional VTC lines at Hudson and Bergen in early November. To date, ICE has not activated the promised additional lines at any of the facilities where immigrants are confined. Although additional VTC lines would allow for more efficient hearings, they would not resolve most of the problems described herein, including the disruption of attorney-client communications, credibility assessments, and the ability of detained immigrants (especially those with disabilities) to review evidence, present their testimony, and fully participate in their proceedings.

27

101.     The result of the shortage of VTC lines and, perhaps more importantly, the result of the regular failure of the technology, is severe: immigration judges routinely delay scheduled proceedings for hours or adjourn them altogether because no line is available, while the detained immigrants sit in county jails, disconnected from the courtroom where they were scheduled to appear.

102.     Relatedly, technical failures with the jail VTC lines regularly require immigration judges to adjourn hearings that otherwise might have been completed in a single appearance.

103.     Detained immigrants often have to wait to learn about the status of their case until a NYIFUP attorney can come to the jail to meet with them, which often cannot happen until days after a scheduled hearing. This in turn impedes the client and attorney's ability to prepare their case.

104.     ICE's refusal to produce detained immigrants frequently causes adjournments in hearings that prolong detention by months. For example, Representative Plaintiff R.F.J.'s individual hearing was initially scheduled for August 15, 2018, some eight months after they were first detained. Because R.F.J's testimony about their experiences in their country of origin was central to their asylum application, R.F.J. filed a motion for them to be produced in person to the Varick Street Immigration Court. R.F.J. was not produced and was not able to testify at all because another judge was using the only VTC line to Bergen that day. As a result, R.F.J.'s individual hearing was rescheduled to November 23, 2018, meaning that R.F.J. would be detained for an additional three months before their case could be heard.

105.     On November 23, 2018, the court was able to connect with R.F.J. over VTC, but R.F.J. was unable to present all of their evidence in the time allotted. Due to the backlog on the

28

Varick docket caused by the limited number of VTC lines, R.F.J's case was continued an additional four months to March 22, 2019, while R.F.J. remains in detention.

106.    Representative Plaintiff J.C. is cognitively impaired. J.C.'s individual hearing was originally scheduled for November 2018, but the immigration judge was unable to connect to the Hudson County Jail, so the hearing was rescheduled to January 9, 2019. Because the immigration judge had scheduled more hearings on January 9 than could be accommodated by the limited number of VTC lines, J.C.'s proceedings were postponed yet again. J.C. had a competency hearing on January 18, 2019, at which point his individual hearing was scheduled for the next available date, on March 12, 2019.

107.    Representative Plaintiff K.T. was scheduled to appear before the immigration judge on November 20, 2018. ICE refused to produce K.T. to the Varick Street Immigration Court from the Orange County Jail. K.T. arrived at the VTC office in the jail for his appearance around 8:30 a.m., at which point an officer at the jail told K.T. to wait.

108.    That morning, K.T.'s immigration judge had previously connected to the sole VTC line at the Bergen County Jail. The judge explained to K.T.'s attorney that he did not want to disconnect from the Bergen line in order to connect to the Orange line for fear that another judge would begin using the only Bergen line. About three and a half hours after K.T. arrived at the VTC office, the officer at the Orange County Jail called Varick to ask when K.T.'s case would be heard. K.T. learned that his attorney had appeared and that his case was adjourned, in part because K.T. was not present. K.T.'s individual hearing is now scheduled to take place in April 2019.

Defendants' Policy Prevents Detained Immigrants from Participating in their Proceedings

109.    None of the county jails where the Putative Class members are detained have sufficient VTC capability to meet the demands of the New York Field Office's detained docket.

29

Technological failures have been rampant since the implementation of the Policy, frequently creating sound and sight barriers between the courtroom and the detained immigrants. Even if Defendants were to provide additional VTC-connected rooms at detention facilities, the widespread and systemic shortcomings of the VTC system would not be remedied.

110.    For example, detained immigrants are often only able to see a narrow slice of the courtroom and the camera often does not track if a different person—including their attorney or the government's attorney—begins to speak.

111.    Similarly, when a speaker moves even inches away from a microphone, it becomes difficult for detained immigrants to hear over VTC and sound often cuts out entirely, causing the detained immigrants to miss critical testimony or instructions from the judge.

112.    Often, the detained immigrants cannot object because they do not realize they are missing some aspect of the proceeding since they cannot see or hear the person who is speaking. Therefore, they cannot know whether the person said something that they missed.

113.    Unreliable technology also causes breaks in the video or audio feed. These limitations are significantly compounded when the individual requires foreign language interpretation. Immigration judges are therefore required to determine the fate of immigrants who they often cannot see or hear and whose credibility they cannot reliably assess.

114.    Due to the failure of the VTC technology, attorneys are frequently forced to choose either to waive their client's right to appear, or to request an adjournment that subjects their client to additional and potentially unnecessary detention. Immigration judges often encourage attorneys to waive their clients' right to appear to avoid a continuance of several months, thereby undermining the detained immigrants' right to fully and meaningfully participate in the proceedings.

115.    For example, Representative Plaintiff A.R.B., who is detained at Bergen jail, was

scheduled for a master calendar hearing on November 29, 2018.  ICE refused to produce A.R.B.

in person that day, and because of a VTC malfunction, A.R.B. was unable to participate in the

hearing in any capacity.  Rather than explain to A.R.B. that his hearing had been delayed because

of problems with the VTC connection, an ICE officer at the jail falsely told him it was because

his attorney was not in court.

116.    A.R.B.'s case was then adjourned to the next day.  The following day, the court

tried for three hours and again failed to connect with A.R.B. over VTC because another judge

was using the one VTC line to Bergen all day.  To avoid continued delays to schedule a master

calendar hearing, A.R.B.'s appearance was waived so that the court could schedule an individual

hearing date.  A.R.B.'s individual hearing is now scheduled for March 20, 2019.

<u>Defendants' Policy Prevents Detained Immigrants from Retaining Counsel, Reviewing
Evidence, and Assisting in their Cases</u>

117.    Because of the Policy, Representative Plaintiffs and the Putative Class members

cannot effectively assist in their own defense in these proceedings.

118.    In the first instance, attorney intake of potential clients has become severely

disrupted.  Before the Refusal to Produce Policy, NYIFUP attorneys could meet with potential

clients at the Varick Street Immigration Court before their initial appearances.

119.    Under the Policy, the shortage of VTC lines routinely interferes with the ability of

NYIFUP providers to intake detained immigrants prior to their initial hearings.  Attorneys cannot

generally screen prospective clients ahead of their first court appearances, except in very limited

circumstances.  The only way detained immigrants can retain an attorney before their initial

appearance is if attorneys are able to travel to the jails or if immigration judges allow attorneys to

use limited VTC lines in their courtrooms when they are not in use for court proceedings.

31

120.     Because neither scenario is effective in practice, detained immigrants must often appear *pro se* for their initial appearances.  Indeed, on several occasions in December 2018, VTC line shortages resulted in detained immigrants being forced to appear *pro se* at their initial hearings because NYIFUP providers were not able to screen these potential clients prior to the start of the hearings.

121.     And although attorneys are usually unable to conduct intake screening interviews over the VTC system, on the occasions that they are provided that opportunity, the presence of other people in both the courtroom and the detention centers significantly compromises confidentiality.

122.     Importantly, NYIFUP attorneys are often unable to access their prospective clients' files and the government's evidence against them prior to their first court date since they can no longer obtain the necessary signed waivers during intake before the detained immigrants' initial appearances.  Therefore, attorneys have no way to assess potential clients' cases or advise them prior to their first appearance.  This impedes the ability of detained immigrants to make informed decisions at their initial appearance.  It is also inefficient and ineffective for both clients who will continue to oppose their removal and for those who may choose to accept an order of deportation.  The latter group cannot be made aware of that option or express their willingness to do so to counsel.  As a result, those detained immigrants are subject to unnecessary prolonged detention.

123.     For example, detained immigrant N.A.R.'s attorney was not able to obtain evidence related to his case from the government until several weeks after he first appeared.  Upon review of the evidence, N.A.R.'s attorney determined that his case would result in mandatory detention and he would be ineligible for bond.  If N.A.R.'s attorney had been able to

review his case and advise him of this important fact at intake, N.A.R. may have taken an order of removal on his first appearance. Instead, N.A.R. waited an additional month in detention only to take removal at his second scheduled hearing.

124.    In addition, people detained by ICE are sometimes unaware that they are actually U.S. citizens, non-deportable lawful permanent residents, or even eligible for immigration relief. Before the Policy, NYIFUP attorneys could advise these people of their grounds to remain in the country before their initial appearance. Under the Policy, there is no opportunity for NYIFUP attorneys to timely advise such individual of their options, and some may accept orders of deportation at their initial appearance.

### Defendants' Policy Prevents Confidential Communications with Counsel

125.    The Policy restricts the Representative Plaintiffs and Putative Class members' ability to communicate confidentially with counsel.

126.    As described above, Defendants' Policy severely impedes detained immigrants' ability to obtain and consult with counsel before their first-scheduled court appearance. Now, attorney-client communications generally take place only when attorneys are able to access and speak with potential clients in county jails or over limited VTC lines.

127.    The Policy also severely limits the ability of NYIFUP attorneys to engage in confidential meetings with their clients throughout the representation. Because ICE refuses to produce detained immigrants to Varick Street Immigration Court for their proceedings, attorneys can no longer consult with their clients in person at the court.

128.    Under the Policy, confidential meeting space at the county jails is even more limited than it was before. Yet even when confidential meeting space is available, NYIFUP attorneys must compete for that space with criminal defense attorneys or other immigration

33

attorneys meeting with their clients in the same facility, causing delays and long wait times and leading to hurried, limited meetings between counsel and client.

129.    Because ICE has not provided adequate confidential meeting space for detained immigrants to meet with their attorneys, NYIFUP attorneys must frequently resort to using VTC lines to relay important information to their client. Those discussions, when not disrupted by technical failures, are not reliably confidential and are often interrupted by other people entering the courtroom.

130.    Opportunities for confidential communications during immigration court proceedings are even further compromised. There is no way for detained immigrants to speak confidentially with their lawyers in the courtroom without suspending the entire proceeding and the court's docket. Because lawyers and their clients can no longer conduct brief confidential discussions or review documents privately in person, everyone—the judge, court staff, government attorneys, witnesses—must clear the courtroom so that the attorney and client can speak over the courtroom's VTC line. However, judges are often reluctant to clear the courtroom for such communications, and typically adjourn the case for weeks or months to avoid delaying all other proceedings scheduled for the day.

131.    In contrast, when clients who were produced in person needed to speak with their attorneys during the proceeding, the attorney could ask for the case to be suspended until second call later in the day. At that point, the attorney could meet with the client in the private attorney-client meeting space outside the courtroom. Meanwhile, the immigration judge could continue working through their docket.

132.    On occasions when a judge does clear the courtroom to provide for an attorney-client discussion, the discussion is limited in time and is rarely confidential as attorneys,

34

courtroom clerks, and judges often pass through the courtroom or can hear the discussion on the other side of closed doors. At times, government attorneys have refused to leave the room to allow for confidential communications with the client. Moreover, officers from the county jails and ICE frequently enter the rooms where the detained immigrants are located during such VTC calls.

133.    For example, Representative Plaintiff P.L. has been forced to appear by VTC for four immigration hearings. On two occasions, P.L. was asked questions by the immigration judge that he did not fully understand. P.L. wanted to confer with his attorney to make sure he understood the questions. But because P.L. was appearing over VTC, he could not speak with his attorney confidentially before answering the immigration judge.

134.    Likewise, during a master calendar hearing on September 14, 2018, the attorney representing detained immigrant J.S.V. asked to speak with her client confidentially to decide whether to ask for an adjournment to seek relief or accept an order of deportation that day. Because ICE refused to produce J.S.V. in person, the immigration judge agreed to clear the courtroom and allow J.S.V. to speak with his attorney confidentially via VTC. Nonetheless, the judge and the government attorney entered the room several times during the short conversation, compromising the confidential nature of the communications. J.S.V. accepted the order of deportation that day and was subsequently deported.

135.    During his hearings over VTC, Representative Plaintiff K.T. appeared from a VTC room in the Orange County Jail that ICE officers also use as an office. The screen for the VTC connection was on one side of a table and the ICE officers' computer screen was on the other side of the same table. ICE officers remained in the room during K.T.'s hearings. Further, a chair was stationed directly outside the office door for the next detained immigrant waiting for

their VTC hearing. The door has remained open during K.T.'s hearings and it was possible for the person waiting outside to overhear the court proceedings being broadcast via VTC.

136.    Instead of clearing a courtroom, many immigration judges simply adjourn cases—sometimes for months—to facilitate the need for a client to confer confidentially with their attorney and allow the court to move on to the next case on the docket. This often occurs regardless of the length of time needed by the attorney and client to confer, and uniformly results in additional time in the county jail.

137.    Detained immigrants and their attorneys are thus frequently faced with an impossible choice between engaging in confidential, necessary communications that will delay their case and result in prolonged detention versus proceeding without those conversations, thereby missing information that could be critical to preserving their rights.

138.    Before the Policy, these types of confidential communications—intake interviews and eligibility determinations, signing retainer agreements, and attorney-client consultations during hearings—were routinely completed without adjournments.

Defendants' Policy Prevents Effective Foreign Language Interpretation Services

139.    The issues surrounding VTC are compounded in proceedings that require the use of foreign language interpreters. Because of their absence from the courtroom and ICE's failure to provide an adequate system of interpretation, the Putative Class members are unable to effectively communicate with interpreters in the courtroom.

140.    Under the Policy, interpretation over VTC is delayed and difficult, if not impossible, to understand, and immigration judges often urge attorneys forego simultaneous interpretation. Interpreters often resort to consecutive interpretation, which refers to interpretation provided after a delay, with attorneys, judges, and other witnesses pausing after a

36

sentence or two of speaking in order for the interpreter to interpret. Consecutive interpretation is less effective, less accurate, and results in unnecessarily long proceedings that can often necessitate adjournments.

141.    The impact is even more severe for detained immigrants who require telephonic interpretation because an in-person interpreter who speaks the relevant language is not available. In those cases, an interpreter in a remote location interprets the court proceedings over a phone line piped into the courtroom.

142.    Thus, detained immigrants participating in the hearings lack a direct line to interpreters—the connection travels over the interpreter's phone line, through the courtroom speakers, is picked up by microphones in the courtroom, and then through the VTC line. The issue similarly impacts interpreters' ability to hear the detained immigrants, as the connection must first travel over VTC and then through the phone line. Hearing telephonic interpretation clearly through both a VTC line and a telephone line is nearly impossible for detained immigrants and for the interpreters.

143.    During a July 31, 2018 hearing, one immigration judge had to adjourn proceedings because the interpreter—conducting interpretation by speakerphone into the courtroom—heard feedback and could not follow what was happening in the courtroom. Meanwhile, the respondent in the case strained to hear the interpretation through the VTC connection. After the detained immigrant's attorney noted multiple interpretation errors on the record, the immigration judge adjourned the proceeding.

<u>Defendants' Policy Impedes Credibility Assessments by Immigration Judges</u>

144.    The Refusal to Produce Policy creates additional, often insurmountable, hurdles to assessing credibility, a critical component of many immigration proceedings. Outcomes in

37

immigration cases frequently depend on the immigration judge's ability to evaluate whether the detained immigrants testified credibly and persuasively.

145.    An immigrant facing removal always has "the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion." 8 C.F.R. § 1240.8(d). The immigrant's credibility is critical to meeting that burden.

146.    In the case of asylum and other claims for discretionary relief, an immigration judge's credibility determination decides an immigrant's fate; that credibility determination can dictate whether the individual will be able to stay in the United States exiled to a place where they fear persecution. Indeed, an immigration judge may grant an application for asylum based on credible testimony alone. *See Matter of Dass*, 20 I. & N. Dec. 120, 124 (BIA 1989); *see also* 8 C.F.R. § 208.13(a).

147.    Because ICE refuses to produce detained immigrants in person, immigration judges must make critical determinations based on blurry images or unclear voices that are frequently interrupted by technical failures and logistical difficulties.

148.    Immigrants also often face impediments to providing complete testimony during hearings held over VTC that impact a judge's ability to assess their credibility. Detained immigrants testifying from jail are forced to testify in rooms that are not private, either due to the presence of ICE officers or other inmates, or allegedly private booths that are not soundproof and where they can be overheard by facility staff or other detained individuals.

149.    The presence of those officers and other detained people—whom the immigration judge cannot see, since they are typically outside the video frame—can serve as a deterrent to a

38

detained immigrant who seeks to testify about the conduct of government officials or about sensitive aspects of his identity or past that he does not wish others in the jail to learn.

150.    For example, Representative Plaintiff A.Q. was scheduled to appear on August 1, 2018 for an individual hearing where the immigration judge would consider his application for relief under the Convention Against Torture.  ICE refused to produce A.Q. in person, leaving the only option to appear by VTC.

151.    During the hearing, A.Q. asked the officers stationed outside the room where he was testifying to close the door.  When they ignored his request, A.Q. told the judge that the door was open and he was uncomfortable because of the sensitive nature of his testimony.

152.    The judge told A.Q. to ask the officers to close the door, but again he was ignored.  After repeated requests, the judge summoned the officers into the room where A.Q. was testifying and instructed them to close the door.

153.    At that point, the officer removed the doorstop but left the door ajar.  A.Q. repeated the judge's instruction to the officer, who responded that the officer needed to be able to hear the proceeding.

154.    A.Q. was forced to choose between reiterating the judge's instruction to the officer (and possible retaliation from the officer) and proceeding with sensitive testimony in front of the officers.  A.Q. decided to continue his testimony.  When the DHS lawyer asked about his sexual orientation, A.Q. wanted to clarify his answer and provide additional context but was afraid to do so because of the presence of the officers.

155.    Because ICE refused to produce A.Q. in person for the hearing, and because a jail officer remained within earshot, he felt uncomfortable providing relevant information to his application for relief via VTC.  The judge was therefore not able to properly evaluate A.Q.'s fear

of returning to his country of origin or the weight of evidence that he presented. The court ultimately denied A.Q.'s petition under the Convention Against Torture on grounds that his claims were speculative.

156.    Similarly, Representative Plaintiff R.F.J.'s proceedings involve testimony regarding deeply personal matters relating to their sexual orientation and gender identity. Under the Policy, R.F.J. will likely have to present that testimony while accompanied by ICE officers in the VTC room at Bergen. R.F.J. believes that the officers may share R.F.J's story with other officers or inmates and subject R.F.J. to worsened harassment within the jail. R.F.J. fears that the presence of officers will affect their ability to provide their full testimony.

Defendants' Policy is Particularly Harmful to Detained Immigrants with Disabilities

157.    The impact of these negative effects is multiplied for individuals with disabilities. Defendants' Policy increases the risk that individuals with disabilities will not be identified or will not be able to adequately access the court or their attorneys.

158.    Poor video and audio quality on VTC lines often causes severe cognitive and intellectual disabilities to go unnoticed. For those immigrants who are unrepresented or interacting with their attorneys for the first time over a VTC line, signs of cognitive impairment—often marked by poor motor skills—are difficult to observe and thus can be overlooked by attorneys and judges with only a narrow view of the person's head.

159.    The GAO Study reported that one immigration judge conceded he was unable to identify a respondent's cognitive disability when conducting the proceeding via VTC, but that the impairment was "clearly evident" in person.[30] Defendants' Policy renders such in-person observations impossible to the significant detriment of Putative Class members.

---

[30] GAO Study at 55.

160.     Even when a detained immigrant's disability is identified, Defendants' Policy prevents them from receiving necessary accommodations that would allow them to adequately participate in their removal proceedings.

161.     Representative Plaintiff P.L. has been diagnosed with unspecified schizophrenia spectrum and other psychotic disorder. He has indications of significant cognitive defects, especially concerning attention, memory, and visual and spatial abilities. However, his disability is not immediately evident to people interacting with him.

162.     After his arrest by ICE, P.L. appeared in person at the Varick Street Immigration Court on June 7, 2018, prior to the adoption of the Policy. During that hearing, he was able to see and hear the judge clearly, communicate with the court via Spanish-language interpretation, and ask questions about issues he did not understand.

163.     Since the implementation of the Policy, ICE has refused to produce P.L. in person for four hearings in his immigration case. Instead, P.L. participated in the hearings over VTC.

164.     During each hearing, P.L. relied on a Spanish-language interpreter to understand what was happening in the immigration court. Because of poor sound quality over the VTC line, P.L. has had difficulty hearing the interpretation. That difficulty is further complicated because the interpreter is not visible on the VTC screen. When the interpreter tries to provide simultaneous, as opposed to consecutive, interpretation, the problem is even more severe.

165.     When P.L. watches a hearing by VTC, he can only see the judge, not the interpreter or either of the attorneys. Because of his mental illness and cognitive difficulties, P.L. has difficulty focusing. Appearing by VTC exacerbates these challenges.

166.     Representative Plaintiff A.Q. has been diagnosed with PTSD and has borderline intellectual functioning. He has a low IQ but high adaptive functioning, *i.e.*, he can generally

41

take care of himself, and his disabilities are not immediately apparent to those who interact with him.

167.     A.Q. was scheduled to appear on August 1, 2018 for an individual hearing where the immigration judge would consider his application for relief under the Convention Against Torture. The judge would not have been readily able to ascertain that A.Q. had cognitive issues from the VTC feed. His attorney argued that he should be produced in person. The request was denied, and A.Q. appeared via VTC. His application for relief was ultimately denied, and he is now appealing the decision.

168.     Representative Plaintiff B.M.B. has been diagnosed with PTSD, major depressive disorder, and a major neurocognitive disorder due to a traumatic brain injury. These disorders mean that B.M.B. has difficulty remembering and understanding events he must testify about as part of his application for relief. As a result of his mental health status, B.M.B. also has an erratic speech pattern, which has made working with interpreters difficult.

169.     B.M.B.'s individual hearing was originally scheduled for September 11, 2018, but it was delayed to October 2018 due to scheduling difficulties. During the October hearing, B.M.B. testified by VTC about traumatic events he experienced as a child as well as his fear of returning to his country of origin. At multiple points during his testimony, he sobbed uncontrollably for several minutes each time.

170.     Although the immigration judge took short breaks in response, no one was with B.M.B. to console him. B.M.B.'s direct testimony continued for about two hours, lengthened in part because the interpreter had difficulties following B.M.B.'s speech pattern. This meant that

there was not sufficient time to complete his case, and B.M.B.'s hearing was continued to January 15, 2019, approximately four months later.[31]

171.    Ultimately, the immigration judge found B.M.B.'s testimony about his fear of returning to his country of origin not credible and denied him relief. B.M.B. is appealing the decision and seeks a remand for new proceedings before the immigration judge.

172.    Representative Plaintiff J.C. has a cognitive impairment and has difficulty focusing during proceedings. After evaluating J.C., his psychologist concluded that J.C. does not "perform well with any situations that are unfamiliar to him" and therefore that "the use of any electronic or virtual communication will have serious repercussions on his performance."

173.    During J.C.'s competency hearing on January 18, 2019, the immigration judge expressed concern that there would be a violation of "due process and fundamental fairness" if J.C. appeared for his merits hearing over VTC, given his mental limitations. The immigration judge stated that, given the psychologist's testimony, "[i]f he appears via video, I see a problem with that. I have to protect his constitutional rights and I have an expert who told me that this guy shut down when he interviewed him because of certain technical type issues." As the immigration judge noted, "clearly the VTC format would add to that stress for anybody, particularly somebody with first grade level cognitive abilities."

174.    Recognizing that the use of VTC may violate J.C.'s constitutional rights, the immigration judge urged ICE to transfer J.C. to the Bergen County Jail before his merits hearing so that he could be produced in person (pursuant to Defendants' temporary practice of producing immigrants detained at Bergen). The immigration judge stated: "His ability to see what's going

---

[31] B.M.B. presented his direct testimony by VTC in October 2018. But because of Defendants' temporary resumption of in-person production at Bergen, B.M.B. was cross-examined in person at Varick Street Immigration Court on January 15, 2019.

on here is quite limited, which because of his limited cognitive functioning in my opinion will clearly add stress. I'm getting all this just from him being there on the screen today, so it stands to reason that if we do a video hearing and [he] starts getting asked cross examination questions, his anxiety is going to ramp up. I think clearly the government should transfer him to Bergen, so that way he's physically produced for the hearing."

175.    Despite the immigration judge's significant and express concerns about the use of VTC in J.C.'s case, the judge did not exercise his authority to order in-person production for J.C.'s merits hearing. J.C. has not been transferred by ICE. His individual hearing is scheduled for March 12, 2019

### Defendants' Policy Harms the Organizational Plaintiffs

176.    Defendants' Policy has also had a severe negative effect on the NYIFUP program.

177.    Specifically, the Policy directly increases the time and cost that the Organizational Plaintiffs expend to provide effective legal services to detained immigrants. As a direct result of the Policy, the Organizational Plaintiffs can no longer screen them for eligibility, conduct initial interviews, or obtain the necessary documents at the time of their initial appearance in immigration court.

178.    Instead, NYIFUP attorneys must drive to county jails outside New York City for the sole purpose of conducting eligibility interviews.

179.    Nor can NYIFUP attorneys engage in confidential communications with their clients at the courthouse after their case has commenced. They must instead travel to the jails where their clients are held.

180.    NYIFUP attorneys typically rent cars to visit their clients, costing the Organizational Plaintiffs thousands of dollars each month.

44

181.    Because of travel time and the shortage of confidential meeting space in the jails,

even a 15-minute conversation with a client regularly takes NYIFUP attorneys away from the

office for four or five hours.

182.    BDS, BxD, and LAS have each represented and will each represent hundreds of

detained immigrants who are adversely affected by the Policy.

183.    Defendants' Policy also interferes with the Organizational Plaintiffs' ability to

represent their clients during hearings.  Because NYIFUP attorneys often represent clients from

several different jails during the same day, they must be physically present in court while their

clients appear over VTC.  As a result, NYIFUP attorneys cannot confer with their clients during

the proceedings or show them the evidence that is being presented.

184.    If a NYIFUP attorney wishes to have a confidential discussion with a client, the

proceedings must be paused and the entire courtroom must be cleared, a practice that does not

ensure confidentiality and which judges are disinclined to allow given their overcrowded

dockets.  Often, judges will adjourn the entire proceeding and schedule it for weeks or months

later.

## CLASS ALLEGATIONS

185.    Representative Plaintiffs P.L., A.Q., K.T., R.F.J., A.R.B., B.M.B., and J.C. seek to

bring this action on their own behalf and on behalf of a class of those similarly situated pursuant

to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure and related to Counts 1-6

("Class Claims").

186.    The proposed Plaintiff Class is defined as: "All individuals who are now, or will

in the future be, detained by the ICE NY Field Office for removal proceedings and who ICE

and/or EOIR has not produced or will not produce in person for those proceedings pursuant to Defendants' Refusal to Produce Policy." ("Plaintiff Class").

187.    A subclass of persons with disabilities bringing claims under the Rehabilitation Act of 1973 is defined as "All individuals who are now or will in the future be detained by the ICE NY Field Office for removal proceedings who have a disability, as defined by the Rehabilitation Act, and who ICE has not produced or will not produce in person for those proceedings because of Defendants' Refusal to Produce Policy" ("Rehabilitation Act Subclass" or "Subclass").

188.    The Plaintiff Class and Rehabilitation Act Subclass meet all of the requirements of Federal Rule of Civil Procedure 23(a).

189.    The Plaintiff Class meets the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is so numerous that joinder would be impracticable. Although the precise size of the Plaintiff Class is unknown, it is comprised of at least thousands of immigrants who are now or will be detained by the ICE NY Field Office in connection with their removal proceedings and who are not being or will not be produced in person for those proceedings pursuant to the Policy. Just in fiscal year 2018, the ICE NY Field Office filed 1,777 new deportation proceedings at Varick Street Immigration Court, and more members are entering the Putative Class every day.[32]

190.    The Rehabilitation Act Subclass meets the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is so numerous that joinder would be impracticable. Although the precise size of the Rehabilitation Act Subclass is unknown, it is comprised of at least dozens of

---

[32] *See New Deportation Proceedings Filed in Immigration Court*, TRACImmigration, https://trac.syr.edu/phptools/immigration/charges/deport_filing_charge.php.

46

immigrants with disabilities who are now or will be detained by the ICE NY Field Office in connection with their removal proceedings and who are not being or will not be produced in person for those proceedings pursuant to the Policy. The government has previously acknowledged that 2 to 5% of all detained immigrants suffer from serious mental illness.[33] Other sources suggest that the true number is much higher.[34] Even adopting the conservative estimate, based on the current and growing number of cases at Varick Street Immigration Court, the Rehabilitation Act Subclass is sufficiently numerous.

191. The Plaintiff Class meets the requirements of Federal Rule of Civil Procedure 23(a)(2) because class members share common issues of law and fact including, but not limited to whether Defendants' Policy violates the statutory and constitutional rights of the Class and Subclass members.

192. The Rehabilitation Act Subclass meets the requirement of Federal Rule of Civil Procedure 23(a)(2) because class members share common questions of law and fact including whether members of the class were entitled to accommodations under the Rehabilitation Act and were denied such safeguards by Defendants through implementation of the Refusal to Produce Policy.

193. The Plaintiff Class and Subclass meet the requirements of Federal Rule of Civil Procedure 23(a)(3) because the Representative Plaintiffs' claims are typical of those of the

---

[33] *See Franco-Gonzalez v. Napolitano*, No. CV 10-02211, 2011 WL 11705815, at *7 (C.D. Cal. Nov. 21, 2011) ("Plaintiffs also point to aggregate government data, reported by ICE in a May 2008 *Washington Post* article, in which the government estimated that  2–5% of immigrants in ICE custody suffer from serious mental illness.") (citing Selected responses from ICE to questions posed by The Washington Post regarding the provision of mental health care to immigration detainees, May 2008, http://media.washingtonpost.com/wp-srv/nation/specials/immigration/documents/day3_ice_mentalhealth.gif (last visited Feb. 7, 2019)).

[34] *See* ACLU, *Deportation by Default: Mental Disability, Unfair Hearings, and Indefinite Detention in the US Immigration System* (July 2010) at 3, https://www.aclu.org/files/assets/usdeportation0710_0.pdf (estimating that "at least 15 percent" of the total immigrant population in detention has a mental disability).

47

Plaintiff Class and of the Rehabilitation Act Subclass respectively. The injuries suffered by the Representative Plaintiffs and the Plaintiff Class and the Subclass arise out of the same policy of the Defendants, specifically the Refusal to Produce Policy. The Representative Plaintiffs' claims are based on the same theories of law as the claims of the Plaintiff Class and Subclass.

194.    The Plaintiff Class and Subclass meet the requirements of Federal Rule of Civil Procedure 23(a)(4). The Representative Plaintiffs will adequately represent the Plaintiff Class and Subclass because they have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Plaintiff Class or Subclass, and will fairly and effectively protect the interests of the Plaintiff Class and Subclass.

195.    The Plaintiff Class and Subclass are represented by Brooklyn Defender Services, The Bronx Defenders, The Legal Aid Society, Wilmer Cutler Pickering Hale and Dorr LLP, and Debevoise & Plimpton LLP. Counsel for the Plaintiff Class and Subclass have the resources, expertise, and experience to prosecute this action, including expertise and experience litigating immigration law, civil rights, and class actions. Counsel for the Plaintiff Class and Subclass know of no conflicts among members of the Plaintiff Class and Subclass or between the attorneys and members of the Plaintiff Class and Subclass.

196.    This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) because the number of current class members is at least in the hundreds and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for the Defendants. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

48

197.     This action is also maintainable as a class action pursuant to Federal Rule of Civil

Procedure 23(b)(2) because the Defendants' policies, practices, actions, and failures that form

the basis of this complaint are generally applicable to all members of the Plaintiff Class and the

Rehabilitation Act Subclass, and the injunctive and declaratory relief sought is appropriate and

will apply to all members of the Plaintiff Class and Subclass.

## COUNT ONE
## Denial of the Right to Procedural Due Process in Violation of the Due Process Clause of the Fifth Amendment

### (Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass)

198.     The allegations in paragraphs 1 – 197 are realleged and incorporated by reference.

199.     The Due Process Clause of the Fifth Amendment forbids the government from

depriving an individual of life, liberty, or property without due process of law.

200.     The Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass

have a significant liberty interest in being freed from immigration detention and ensuring that

their immigration proceedings comport with due process.

201.     Defendants' Refusal to Produce Policy increases the risk that the Representative

Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass will be detained for extended periods

of time, unable to access available immigration relief, or improperly removed.

202.     The costs and administrative burden of providing additional, and necessary,

process to the Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass is

minimal and would avoid the risks created by the Defendants' Policy.

203.     The Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass

have suffered and will imminently suffer irreparable injury as a result of Defendants' Refusal to

Produce Policy, and they are entitled to injunctive relief to avoid further injury.

49

**COUNT TWO**
**Denial of Right to Counsel of Choice in Violation of the INA and APA**

**(Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass)**

204.    The allegations in paragraphs 1 – 203 are realleged and incorporated by reference.

205.    The Immigration and Nationality Act guarantees the Representative Plaintiffs,

Plaintiff Class, and Rehabilitation Act Subclass "the privilege of being represented . . . by

counsel of [their] choosing" in their removal proceedings. 8 U.S.C. § 1229a(b)(4)(A).

206.    Under the Administrative Procedure Act, courts must "hold unlawful and set

aside" agency action that is "not in accordance with law," "contrary to constitutional right," in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is

"without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

207.    The Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass are

represented by counsel, primarily attorneys provided through NYIFUP, in their removal

proceedings.

208.    Defendants' Refusal to Produce Policy restricts the ability of the Representative

Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass to associate with, seek counsel of, and

communicate confidentially with their attorneys.

209.    Defendants implemented the Policy in violation of the INA's right to

representation by counsel of choice without reasoned explanation and in contradiction of the

evidence.

210.    The Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass

have suffered and will imminently suffer irreparable injury as a result of Defendants' Refusal to

Produce Policy, and they are entitled to injunctive relief to avoid further injury.

**COUNT THREE**

**Denial of Right to a Full and Fair Hearing in Violation of the INA and APA**

**(Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass)**

211.    The allegations in paragraphs 1 – 210 are realleged and incorporated by reference.

212.    The Immigration and Nationality Act guarantees the Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass "a reasonable opportunity to examine the evidence against [them], to present evidence on [their] own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B).

213.    Under the Administrative Procedure Act, courts must "hold unlawful and set aside" agency action that is "not in accordance with law," "contrary to constitutional right," in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

214.    Defendants' Refusal to Produce Policy creates a substantial likelihood that the rights of the Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass to a full and fair hearing under the Immigration and Nationality Act will be violated.

215.    Defendants' Policy creates a substantial risk that the errors will occur in the removal proceedings of the Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass, and interfere with their rights to examine the evidence against them, to present their own evidence, and to cross-examine the Government's witnesses.

216.    Despite such harms, Defendants implemented the Refusal to Produce policy without reasoned explanation and in contradiction of the evidence.

217.    The Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass have suffered and will imminently suffer irreparable injury as a result of Defendants' Refusal to Produce Policy, and they are entitled to injunctive relief to avoid further injury.

### COUNT FOUR
**Denial of Right to Access Courts in Violation of the First and Fifth Amendments**

**(Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass)**

218.    The allegations in paragraphs 1 – 217 are realleged and incorporated by reference.

219.    The Petition Clause of the First Amendment and the Due Process Clause of the

Fifth Amendment guarantee the Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act

Subclass the right of access to courts and prohibits the government and its agents from

unjustifiably obstructing that access.

220.    This guarantee includes the right of the Representative Plaintiffs, Plaintiff Class,

and Rehabilitation Act Subclass to communicate with their attorneys.  The Representative

Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass therefore have a right to meaningful

access to their attorneys in order to defend themselves in their removal proceedings.

221.    The Representative Plaintiffs and members of the Plaintiff Class and

Rehabilitation Act Subclass are represented by counsel through the NYIFUP program in their

removal proceedings.

222.    The Refusal to Produce Policy unjustifiably obstructs the ability of the

Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass to access legal

representation and interferes with other aspects of their right of access to the courts.

223.    The Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass

have suffered and will imminently suffer irreparable injury as a result of Defendants' Refusal to

Produce Policy, and they are entitled to injunctive relief to avoid further injury.

### COUNT FIVE
**Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701**

**(Representative Plaintiffs and Rehabilitation Act Subclass)**

224.    The allegations in paragraphs 1 – 223 are realleged and incorporated by reference.

225.    The Rehabilitation Act requires Defendants DHS and ICE to make reasonable accommodations for detained immigrants with disabilities to ensure they can access government benefits and opportunities. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.").

226.    The INA and the Board of Immigration Appeals both contemplate numerous safeguards to ensure that a noncitizen is able to fully participate in immigration proceedings. *See, e.g.,* 8 C.F.R. § 1240.4 (providing that an "attorney, legal representative, legal guardian, near relative, or friend . . . shall be permitted to appear on behalf of" an incompetent noncitizen); *Matter of M-A-M-*, 25 I. & N. Dec. 474, 483 (B.I.A. 2011) (noting that examples of "appropriate safeguards include, but are not limited to, . . . identification and appearance of a family member or close friend who can assist the [noncitizen] and provide the court with information; docketing or managing the case to facilitate the respondent's ability to obtain legal representation and/or medical treatment in an effort to restore competency; [and] participation of a guardian in the proceedings").

227.    Representative Plaintiffs and members of the Plaintiff Class with cognitive and psychological disabilities (the Rehabilitation Act Subclass) qualify as persons with a disability for purposes of Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a) (stipulating that "no otherwise qualified individual with a disability . . . , shall, solely by reason of her or his disability" be "denied the benefits of . . . any program . . . conducted by any Executive agency"); *see also* 29 U.S.C. § 705(20)(A) (defining "individual with a disability" to include a person who has a "mental impairment which . . . constitutes or results in a substantial impediment").

53

228. Defendants DHS, ICE, and EOIR are Executive agencies within the meaning of the Rehabilitation Act.

229. The Rehabilitation Act requires Defendants DHS, ICE, and EOIR to make reasonable accommodations for those class members with disabilities to ensure that they are able to access the same protections and benefits as other Plaintiff Class members, regardless of their disability. *See* 29 U.S.C. § 794(a) (requiring heads of Executive agencies to "promulgate such regulations as may be necessary" to prevent "individual[s] with disabilities" from "be[ing] denied the benefits of" federal programs "solely by reason of" their disabilities).

230. Despite the need to screen Plaintiff Class members for disabilities, the Refusal to Produce Policy prevents government officials, court staff, judges, and even attorneys from identifying those individuals who require a reasonable accommodation.

231. Even where Plaintiff Class members identify themselves, or their attorneys identify them, as individuals with disabilities in need of a reasonable accommodation in the form of in-person production, the blanket Refusal to Produce Policy disallows in-person hearings for these class members and prevents them from fully participating in their hearings.

232. By enforcing its Refusal to Produce Policy without identifying and providing reasonable accommodation for those Plaintiff Class members with disabilities, Defendants DHS and ICE discriminate against class members with disabilities in violation of Section 504 of the Rehabilitation Act.

## COUNT SIX
### Arbitrary and Capricious Action in Violation of the APA

### (Organizational Plaintiffs, Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass)

233. The allegations in paragraphs 1 – 232 are realleged and incorporated by reference.

234. Under the Administrative Procedure Act, courts must "hold unlawful and set aside

54

agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

235.    Agency action must be overturned "when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

236.    Defendants' Refusal to Produce Policy reverses years of settled and well-considered practice without reasoned explanation and in contradiction to the evidence.  The Policy is not necessary to protect ICE officers, court personnel, detained immigrants, or the public from a continuing security threat.

237.    Defendants entirely failed to consider important aspects of the problem, including the Policy's interference with due process, detained immigrants' ability to retain counsel, attorney-client communications, and the ability of attorneys to represent their clients.

238.    Defendants' unfounded and inconsistent statements indicate that the stated reason for the Refusal to Produce Policy is pretextual.

239.    The Organizational Plaintiffs, Representative Plaintiffs, Plaintiff Class, and Rehabilitation Act Subclass have suffered and will imminently suffer irreparable injury as a result of Defendants' Refusal to Produce Policy, and they are entitled to injunctive relief to avoid further injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.      Declare that Defendants' Refusal to Produce Policy violates the First and Fifth

Amendments of the U.S. Constitution, the Immigration and Nationality Act, the Administrative

Procedure Act, and the Rehabilitation Act.

2.      Permanently enjoin Defendants from relying exclusively on VTC technology to

conduct removal proceedings for individuals detained by the ICE NY Field Office;

3.      Permanently enjoin Defendants from requiring members of the Rehabilitation Act

Subclass to appear for their hearings exclusively via VTC;

4.      All other injunctive relief necessary to ensure that any use of VTC comports with

the constitutional and statutory rights of the Plaintiffs;

5.      Award Plaintiffs their reasonable fees, costs, and expenses pursuant to 28 U.S.C.

§ 2412; and

6.      Award such additional relief as the interests of justice may require.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable raised by the Class Action

Complaint.

Feb 12 , 2019

Respectfully submitted,

Brooke Menschel

Jennifer Williams
Julie Dona
THE LEGAL AID SOCIETY
199 Water Street, 3rd Floor
New York, NY 10038
Tel: (212) 577-3300
*Class Counsel*

Susan Reagan Gittes
Pooja A. Boisture
Dana Rehnquist
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY
Tel: (212) 909-6000
Fax: (212) 909-6836
*Class Counsel and Counsel for Plaintiff LAS*

Brooke Menschel
Jessica Nitsche
Sonia Marquez
BROOKLYN DEFENDER SERVICES
177 Livingston Street, 7th Floor
Brooklyn, NY 11201
Tel: (718) 254-0700
*Class Counsel*

Robert J. Gunther, Jr
Christopher Bouchoux
William C. Kinder
Jeffrey A. Dennhardt
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
*Class Counsel and Counsel for Plaintiffs
BDS and BxD*

Shakeer Rahman
Jenn Rolnick Borchetta
Johanna B. Steinberg
THE BRONX DEFENDERS
360 E. 161st Street
Bronx, NY 10451
Tel: (718) 838-7878
*Class Counsel*

## VERIFICATION

STATE OF NEW YORK       )
                        )
COUNTY OF NEW YORK   )


Sworn to and subscribed this
___ day of ___Feb___, 2019

Notary Public

JOSEPH M CAIAZZO
Notary Public, State of New York
No. 01CA6194440
Qualified in Kings County
Commission Expires September 29, 20__